## UNITED STATES v. CARLISLE.

### No. 6910.

District Court, S. D. Texas, Houston Division.

June 8, 1937.

John Henry Lewin, Hammond E. Chaffetz, W. B. Watson Snyder, and Grant W. Kelleher, Special Assts. to the Atty. Gen., and Douglas W. McGregor, U. S. Dist. Atty., and George O'Brien John, Asst. U. S. Dist. Atty., both of Houston, Tex., for the United States.

Archie D. Gray, David Proctor, Robert F. Carter, H. L. Stone, and John E. Green, Jr., all of Houston, Tex., for defendant.

KENNERLY, District Judge.

The defendant, O. H. Carlisle, residing in Houston, in this district and division, together with a large number of other individuals and corporations, residing or domiciled in various parts of the United States, including the Gulf Oil Corporation of the State of Pennsylvania and the Gulf Refining Company of the State of Delaware (for convenience called Gulf Companies), with whom it is alleged defendant is, or has been, associated, or has, or has had, a position, and that he is or has been engaged in the management of their affairs, and including three other individuals of the State of Pennsylvania, alleged to be officers of or connected with Gulf Companies, have been indicted by a grand jury in the District Court of the United States for the Western District of Wisconsin, charged with violations of section 1 of the Sherman Anti-Trust Act (section 1, title 15 U.S.C. A.), and this is a proceeding under Revised Statutes, § 1014, as amended (section 591, title 18 U.S.C.A.), for the arrest and commitment of defendant; to the end that he may be removed to such district for trial on such indictment.

In a similar proceeding before the United States commissioner, of this district and division, defendant was discharged, and, while this hearing is de novo, it is (by agreement) upon the record made before the commissioner. While the government offered only the indictment and certain documentary evidence, and the defendant only offered his own testimony, that of three other witnesses, and certain documentary evidence, the record consists of more than 1,900 typewritten pages. The case has been ably argued and briefed.

928

■ 1. The question for decision is not whether defendant is or is not guilty as charged in the indictment. The indictment having been offered by the government, the question is, Does the evidence offered by the defendant require a finding that there is no substantial ground for bringing him to trial on the indictment? If it does, he should be discharged. If it does not, he should be committed. United States ex rel. Kassin v. Mulligan, 295 U.S. 396, 401, 55 S. Ct. 781, 783, 79 L.Ed. 1501, and cases there cited and discussed.

A quotation from United States ex rel. Kassin v. Mulligan, supra, may be found helpful (italics mine):

"It may not with perfect accuracy be said, as in some removal decisions it has been said or implied, that the indictment is evidence of the facts that it alleges. But it fulfills the constitutional requirement (Amendment 5), establishes probable cause (Amendment 4), and is itself authority to bring the accused to trial. In the absence of evidence requiring a finding that there is no ground for the prosecution, the government is entitled to an order for removal. Beavers v. Haubert, 198 U.S. 77, 90, 25 S.Ct. 573, 49 L.Ed. 950; Price v. Henkel, 216 U.S. 488, 493, 30 S.Ct. 257, 54 L.Ed. 581. Cf. South Carolina v. Bailey, 289 U.S. 412, 420, 53 S.Ct. 667, 77 L. Ed. 1292. The indictment is not conclusive, for under section 1014 the petitioner has the right to introduce evidence in opposition to the showing made against him. Tinsley v. Treat, supra, 205 U.S. 20, 32, 27 S.Ct. 430, 51 L.Ed. 689. But as the order of removal adjudges nothing affecting the merits of the case and amounts to no more than a finding that the accused may be brought to trial, the Commissioner is without power to rule on disputed questions of law whether they relate to the sufficiency of the indictment or the validity of the statute on which the charge is based. Henry v. Henkel, 235 U.S. 219, 229, 35 S. Ct. 54, 59 L.Ed. 203; Stallings v. Splain, 253 U.S. 339, 344, 345, 40 S.Ct. 537, 64 L. Ed. 940; Morse v. United States, 267 U.S. 80, 83, 45 S.Ct. 209, 69 L.Ed. 522. And for like reasons he may not decide controverted or doubtful issues of fact. Rodman v. Pothier, 264 U.S. 399, 402, 44 S.Ct. 360, 68 L.Ed. 759. *In view of the delays and obstructions that it is possible for persons accused to obtain and interpose by misuse of the right to be heard before removal (cf. Salinger v. Loisel, 265 U.S. 224, 238,* *44 S.Ct. 519, 68 L.Ed. 989), section 1014 is to be construed quite favorably to the government's applications* (Benson v. Henkel, supra, 198 U.S. 1, 15, 25 S.Ct. 569, 49 L. Ed. 919; Haas v. Henkel, supra, 216 U.S. 462, 475, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann. Cas. 1112)."

Section 1 of the Sherman Act (section 1, title 15 U.S.C.A.), upon which the indictment is bottomed, is as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. (July 2, 1890, c. 647, § 1, 26 Stat. 209.)"

■ The indictment names defendant, along with many other individuals and corporations, describes defendant as being (or having been) associated with, or having (or having had) some official title or position with, the Gulf Companies, or one of them, the nature of which is unknown to the grand jurors. It sets forth that the defendant was, during the period covered by the indictment, actively engaged in the management, direction, and control of the affairs and policies of the Gulf Companies, or one of them, and particularly those affairs and policies covered by the indictment. After alleging the marketing conditions of gasoline in the area referred to as the Mid-Western area (including the Western District of Wisconsin), that the defendant major oil companies (including Gulf Companies) marketed and distributed gasoline in that area during the period covered by the indictment, describing their method of doing business in such area, that gasoline so marketed and distributed is manufactured largely from crude oil produced in the East Texas Field and the Mid-Continent Field, and that the spot market price of gasoline in each the East Texas Field and the Mid-Continent Field directly and substantially influenced the spot market tank car price of gasoline in other areas, all defendants (including defendant Carlisle) are charged with conspiracy under such Sherman Act in the following language:

"Beginning in the month of February 1935 and continuing to the date of the presentation of this indictment, defendants and certain persons hereinafter referred to, and other persons to the grand jurors unknown, well knowing all the foregoing facts, have combined and conspired together for the purpose of artificially raising and fixing the tank car prices of gasoline in the aforementioned spot markets, and, as intended by them, defendants have artificially raised and fixed said spot market tank car prices of gasoline and have maintained said prices at artificially high and noncompetitive levels, and at levels agreed upon among them and have thereby intentionally increased and fixed the tank car prices of gasoline contracted to be sold and sold in interstate commerce as aforesaid in the Mid-Western area (including the Western District of Wisconsin), and have arbitrarily, by reason of the provisions of the prevailing form of jobber contracts above described in paragraph 11, exacted large sums of money from thousands of jobbers with whom they have had such contracts in said Mid-Western area (including the Western District of Wisconsin), and in turn have intentionally raised the general level of retail prices prevailing in said Mid-Western area (including the Western District of Wisconsin). In so doing, defendants have then and there engaged in an unlawful combination and conspiracy in restraint of trade and commerce in gasoline among the several states of the United States in violation of section 1 of the Act of Congress of July 2, 1890 [15 U. S.C.A. § 1], known as the Sherman Antitrust Act."

The evidence shows defendant to be now, and to have been for about thirty-three years, associated with or employed by the Gulf Companies. Since 1932, he has been division sales manager of the Houston (Texas) Division of the company, which division includes the area described in the indictment as the East Texas Field. It shows or tends to show that he was, during the time covered by the indictment, actively engaged in some degree in the management, direction, and control of the affairs of the Gulf Companies in such division, including the East Texas Field.

On direct examination, defendant's answers (inadvertently I am sure) leave the impression that he was almost wholly without knowledge of the conditions in the so-called Mid-Western area as described in the indictment, which, considering his long connection with, and the nature of his connection with, the oil industry, would be unusual. His cross-examination, however, reveals general familiarity with such conditions, and reveals knowledge that the spot market tank car prices of gasoline in that area was and is affected by the spot market price of gasoline in other areas, including the East Texas Field, etc. I quote briefly from his answers on cross-examination:

"Q. And you are, of course, vitally interested in the spot market? A. We would be down here, yes.

"Q. You would be wherever your company is located. A. Well, I am speaking of my end of it.

"Q. You are especially interested down here. A. Yes.

"Q. Now, the spot market down here is not entirely disassociated from the spot markets elsewhere? A. Well, as I said this morning, there is no market that can be disassociated from another market—

"Q. That is right. A. (continuing).— completely.

"Q. Due to economic conditions they interact and the tendency of one is to be affected in the same way that another is affected? I say the tendency is? A. Well, I would say that one market is affected to some degree or some measure by another market.

"Q. That is right. From the same influences? A. From what?

"Q. From the same influences? A. Well, if they all prevail in the same areas, yes, sir, I would say so.

"Q. That is right. And influences prevailing only in one area would have an effect on the spot market in another area? A. Only in so far as it depressed or raised the price of that particular market as compared with the market elsewhere and its location with reference to that supply.

"Q. That is right. We will take a concrete example. If there was a depression in the price of gasoline in the East Texas spot market and the price in the Mid-Continent spot market had remained stable gasoline would tend to flow from East Texas into the Mid-Continent market where a higher price would be obtainable and when enough of the gasoline flowed there at a price below the Mid-Continent price the Mid-Continent price would become depress-

ed? A. I don't think there is any question but what that would be true.

"Q. That is right. So it is a fact that the spot markets do directly influence each other? A. Well, to the degree that I indicated, to my knowledge.

"Q. Yes. Now the spot markets are wholesale markets, are they not? The spot tank car market is what could be called the wholesale market? A. Yes, I would take it as such."

So that the first really controverted issue is whether defendant was a party to the alleged conspiracy as quoted above, and had knowledge or connection with its alleged formation and workings. Defendant makes a positive statement that he was not. But this is only defendant's positive statement that he was not against the positive allegations or statements in the indictment that he was. An examination of the testimony of the other witnesses and of the documentary evidence adds little or nothing to either side of this particular issue. And while it is true that the exact time and place of the formation of the conspiracy is not alleged in the indictment, I think that under the quoted language from United States ex rel. Kassin v. Mulligan, the issue must, on a hearing such as this is, be resolved in favor of the government.

But there are other issues presented.

It is probable that the wording quoted is sufficient allegation of a conspiracy under such act, but the indictment does more. It sets forth how and in what manner and by what means the conspiracy was effectuated. I quote further (italics mine):

"Beginning in the month of February 1935 and continuously to the date of the presentation of this indictment, as aforesaid, defendant major oil companies, acting through or under the direction of their respective officers and agents and those of their subsidiaries (or former subsidiaries) hereinabove made defendants herein, and through others of their officers and agents, some of them hereinafter referred to, and through defendants Bourque and Boggs, and other persons to the grand jurors unknown, have knowingly and unlawfully engaged and participated *in two concerted gasoline buying programs hereinafter referred to as (a) the East Texas buying program and (b) the Mid-Continent buying program,* for the purchase by each of them from independent refiners in spot transactions of large quantities of gasoline in the East Texas and Mid-Continent fields at uniform, high, and at times progressively increased prices, some of said defendant major oil companies purchasing gasoline in the East Texas field and others of them in the Mid-Continent fields, and some of said defendant major oil companies making such purchases in both buying programs as hereinafter more fully set forth, but each and all of them acting pursuant to the common purposes set forth in paragraph 18 of this indictment. Said buying programs are more fully described as follows: * * *

"Throughout the period aforesaid, defendants Sinclair, Gulf, Texas, Pure, Continental, Tide Water, Tide Water Oil, Cities Service, Cities Service Export, and Louisiana Oil, have made large and increased purchases of gasoline in spot transactions from most of the independent refiners located in the East Texas field. Said independent refiners have been members of an association known as the East Texas Refiners Marketing Association which was formed in February 1935, with the knowledge and approval of some of the defendants, for the purpose of selling and facilitating the sale of gasoline to defendant major oil companies.

"[Here follows the names of a large number of independent oil companies]

"Purchases of gasoline through said association, from the respective members thereof, have been made at the instigation and under the supervision and direction of defendants Arnott and Carnes, with one Neil Buckley, employee of Cities Service Export, acting in a liaison capacity between said association and the defendant major oil companies and also instigating and directing said purchases. Said Buckley acted in said capacity under the instructions of defendant Cities Service and defendants Brendli, Coates, and Fraucauff. With the approval of said Buckley, one Robert N. Cline has been secretary and manager of said association and has acted in said capacity, allotting orders for gasoline received from defendant major oil companies among the members of said association. Each of the defendant major oil companies named in the preceding paragraph has taken a part of the large quantities of gasoline purchased through said association, as from time to time arranged among them. Said quantities of gasoline purchased from said independent refiners through said East Texas Refiners Marketing Association have

amounted to more than 50% of all the gasoline produced by said independent refiners. Said purchases have been in excess of the amounts which the aforementioned defendant major oil companies would have purchased apart from their participation in said buying program, and they have been made at uniform, high, arbitrary, and noncompetitive prices, and from time to time at progressively increased prices, as agreed upon by said defendant major oil companies, all with the unlawful purposes and effects aforementioned. In furtherance of said unlawful purposes said independent refiners have, at the instance of defendant Arnott, and the aforesaid Buckley, curtailed their production of gasoline. All of the companies and individuals mentioned in this and in the preceding paragraph, whether or not made defendants herein, have known of said unlawful purposes and have actively engaged and cooperated in the unlawful combination and conspiracy set forth in this indictment."

Most of the evidence in the record is with respect to whether, in effectuation of such conspiracy and during the period set forth in the indictment, there was a so-called "East Texas Buying Campaign" carried on by the defendants or some of them in the East Texas Field for the purpose of artificially and unlawfully raising and fixing the prices of gasoline in such area and in said Mid-Western area, and, if so, what, if any, connection defendant had with it.

Although defendant insists that he was not during the time in question active in connection with the business of the Gulf Companies, one cannot, in considering this record, escape the conclusion that, while all the details of the business of the companies during such time may not have had the benefit of his scrutiny, he was familiar with it, and that, if there was an East Texas Buying Campaign such as is alleged in the indictment he knew of it and took part in it.

And when the testimony of defendant, and that of the witnesses Gwyn, Slater, and May, on direct and cross examination (and particularly that of May on cross-examination), and the documentary evidence, particularly the telegram of June 28, 1935, are considered, I do not think it can be said that it requires a finding that there was no such East Texas Buying Campaign. And that on the whole case it must be said that the evidence does not require, when viewed in the light of the authorities, a finding that there is no substantial ground for bringing the defendant to trial on the indictment, leaving it for the court or a jury in the district where the indictment is pending to determine his guilt or innocence, on which question I express no opinion.

■ 2. Defendant says that no offense is charged against him in the indictment (a) because the indictment does not allege that he, as an individual, entered into the alleged conspiracy, or that he performed, or authorized the performance of, any of the acts which created or carried out the alleged conspiracy; and (b) the indictment affirmatively alleges that his connection with the Gulf Companies, which are charged with having entered the alleged conspiracy, is unknown.

I view this attack on the indictment as one coming within Morse v. United States, 267 U.S. 80, 83, 45 S.Ct. 209, 210, 69 L.Ed. 522, and cases there cited and discussed, and United States ex rel. Kassin v. Mulligan, supra. But, if not, and it is within the scope of this inquiry, I think the attack must fail when the indictment as a whole is looked to.

■ 3. Defendant says that the allegations in the indictment are insufficient to confer venue and jurisdiction on the United States District Court for the Western District of Wisconsin, in which the indictment is pending.

The place of the formation of the alleged conspiracy is not set forth in the indictment. The indictment alleges its formation by *all* defendants, and certain acts by *all* defendants, in the "Mid-Western Area," including the Western District of Wisconsin, certain acts by some of the defendants (called the East Texas Buying Program) in the East Texas Field, and certain acts by some of the defendants in the Mid-Continent Field (called the Mid-Continent Buying Program). Then certain oil journals and their owners are alleged to have committed certain acts in an area including the Western District of Wisconsin, and the major oil company defendants (other than the Gulf and another) are alleged to have committed certain acts in a certain area, including the Western District of Wisconsin.

I think these are sufficient allegations of venue. Hyde v. United States, 225 U. S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann. Cas.1914A, 614; United States v. Trenton

Potteries Co., 273 U.S. 392, 402, 47 S.Ct. 377, 381, 71 L.Ed. 700, 50 A.L.R. 989; Easterday v. McCarthy (C.C.A.) 256 F. 651.

From what has been said, it follows that the defendant should be committed to await removal. Let such an order be prepared and presented.